FILED
United States Court of Appeals
Tenth Circuit

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

July 7, 2023

Christopher M. Wolpert
Clerk of Court

_____

JOHANNA DABBS,

    Plaintiff - Appellant,

v.

SHELTER MUTUAL INSURANCE
COMPANY, a/k/a Shelter Mutual
Insurance Co.,

    Defendant - Appellee.

No. 21-6169
(D.C. No. 5:15-CV-00148-D)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BACHARACH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

Johanna Dabbs appeals the district court's grant of summary judgment for her automobile insurer, Shelter Mutual Insurance Company, on her state-law claim for breach of the duty of good faith and fair dealing. She contends that Shelter is liable for bad faith both because it failed to timely accept offers to settle a third-party claim within her policy limits and because its entire course of conduct while handling that claim was unreasonable.[1] But we see no reason to disturb the district court's

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[1] At times, we use the phrase "bad faith" as a shorthand reference to a breach of the duty of good faith and fair dealing.

judgment based on either of these arguments. Even when viewed in the light most favorable to Dabbs, the record evidence establishes that Shelter had a good-faith belief in a justifiable reason for not timely accepting the policy-limits offers. And Dabbs has waived her argument that Shelter is liable for bad faith because its entire course of conduct while handling the third-party claim was unreasonable; even if she had not, the record evidence viewed in Dabbs's favor shows that Shelter acted reasonably when handling that claim. We therefore agree with the district court that no reasonable jury could find that Shelter acted in bad faith, and we affirm summary judgment in favor of Shelter.

## Background

After purchasing a car-insurance policy from Shelter, Dabbs ran a red light and caused an accident in Texas. The accident injured three third parties: April Andrade, Mayra Sierra, and Vincent Calderon. Two days later, Shelter assigned its claim adjuster, Sheri Edwards, to investigate any potential third-party claims against Dabbs. Immediately, Edwards called Andrade and Sierra. Andrade reported that her shoulder and back were sore. Sierra advised that she had a sore neck and arm, and that her passenger, Calderon, had sustained a fractured leg. Edwards attempted to speak with Calderon directly that same day, but he did not answer her call.

Four days after the accident, Edwards received a fax from attorney Joseph Gourrier advising that he represented both Calderon and Sierra. On a call with Gourrier that same day, Edwards explained that Dabbs's policy only provided minimum liability coverage. The next day, Gourrier called Edwards and told her that

2

because the accident had occurred in Texas, Shelter would need to comply with minimum liability coverage under Texas law: $30,000 per person, and $60,000 per accident. Edwards promptly agreed.

About one month after the accident, Gourrier sent Edwards a letter offering to settle Calderon's claim for Dabbs's per-person policy limits—$30,000. The letter included some of Calderon's medical records and a surgical estimate for $32,400. Gourrier gave Edwards five days to accept the offer. Within minutes, Edwards acknowledged the offer and requested Calderon's medical bills to properly value his claim. Gourrier responded that the previously enclosed medical records and surgical estimate were sufficient to show that Calderon's damages exceeded Dabbs's policy limits of $30,000 per person. Gourrier also warned Edwards that he would file a lawsuit if Shelter did not accept the offer within five days.

The following day, Edwards contacted her supervisor, who, in turn, spoke with Shelter's in-house counsel. Together, they determined that Shelter could not accept Calderon's offer until Shelter received Calderon's medical bills, medical records from the doctor who prepared Calderon's surgical estimate, and information on the extent of Andrade's and Sierra's injuries. Edwards attempted to update Gourrier on Shelter's position by phone, but he did not answer. So Edwards instead sent Gourrier a letter explaining that because Shelter needed to divide the $60,000 available under Dabbs's policy among all three claimants, Shelter could not accept Calderon's offer without more information on the extent of each claimant's injuries. Edwards also requested an extension to respond to Calderon's offer.

The day after the initial offer expired, Edwards received a second letter from Gourrier with Calderon's medical bills and medical records from the doctor who prepared Calderon's surgical estimate. In that letter, Gourrier renewed the offer to settle Calderon's claim for $30,000 and again warned Edwards that if Shelter did not accept within five days, he would "file a lawsuit and seek to recover an excess judgment against [Dabbs]." App. vol. 2, 484. After receiving Calderon's medical bills and records, Edwards determined that Calderon's claim was indeed worth $30,000. But she did not immediately accept Calderon's offer because she still needed information on the extent of Andrade's and Sierra's injuries to ensure that the remaining $30,000 available under Dabbs's policy would cover all three claims. Edwards called Gourrier to request information on his client Sierra's injuries, but no such information promptly followed.

Confronted with an imminent threat to sue and believing that Gourrier was being unreasonable, Shelter hired outside counsel, Jakki Hansen, to help resolve Calderon's claim. Hansen then sent Gourrier a letter three days before Calderon's second offer expired, again explaining that Shelter could not accept the offer without information on the extent of Andrade's and Sierra's injuries. Hansen advised Gourrier that Shelter had a duty to fully investigate all three claimants' injuries before committing any portion of the limited coverage available under Dabbs's policy to Calderon. Noting that Gourrier also represented Sierra, Hansen reiterated Shelter's request for information on Sierra's injuries.

Meanwhile, Edwards kept Dabbs apprised of Shelter's efforts to resolve Calderon's claim and of Gourrier's threat to sue. When Edwards asked Dabbs how she would like to proceed, Dabbs responded "that she ha[d] been very pleased with Shelter's handling of [Calderon's] claim to date and trust[ed Shelter's] judgment." *Id.* at 478. Edwards also confirmed Dabbs's understanding that Gourrier "may file [a] lawsuit if Shelter d[id] not pay the $30,000 demand by the deadline." *Id.* Ultimately, Shelter did not accept Calderon's second offer by the deadline Gourrier imposed.

The day after Calderon's second offer expired, Gourrier advised Hansen that he intended to sue Dabbs for the full amount of Calderon's damages in excess of Dabbs's policy limits. Two days later, Shelter determined that it could settle Calderon's claim for $30,000 because the remaining $30,000 would likely cover Sierra's and Andrade's potential claims. So that same day, with Dabbs's approval, Hansen informed Gourrier that Shelter would settle Calderon's claim for $30,000. But Calderon rejected the offer.

Over the next few months, Hansen continued settlement discussions with Gourrier, but Gourrier maintained that Calderon would "re[]consider settling" only if "Shelter would 'pad' their offer and come up with more than $30,000." *Id.* at 504. Shelter declined to do so, and Dabbs advised Shelter that she and her husband lacked the financial resources to "pad" any offer. As a result, Calderon sued Dabbs and her husband in Texas state court to recover the full amount of his damages. In accordance with its obligations under the policy, Shelter retained separate defense counsel to represent Dabbs and her husband in the state-court proceedings. Calderon's claims

5

against Dabbs's husband were dismissed, but his claim against Dabbs proceeded to trial after efforts to mediate failed. As trial approached, Dabbs complained to Shelter about her counsel's unresponsiveness, and two weeks before trial, Shelter replaced Dabbs's counsel with the attorney who had represented Dabbs's husband. Calderon ultimately prevailed at trial and obtained an excess judgment against Dabbs, which was affirmed on appeal.

Based on these events, Dabbs filed this lawsuit against Shelter in Oklahoma state court. Shelter then removed the case to federal court, asserting diversity jurisdiction under 28 U.S.C. § 1332. As relevant here, Dabbs's amended complaint alleged that Shelter breached its state-law duty of good faith and fair dealing by not timely accepting Calderon's policy-limits offers, by improperly investigating the third-party claims, and by inadequately defending her in Calderon's lawsuit. The district court, however, granted summary judgment for Shelter and dismissed Dabbs's bad-faith claim.[2]

Dabbs now appeals.

## Analysis

We review the district court's grant of summary judgment de novo, applying the same standards that the district court applied. *SRM, Inc. v. Great Am. Ins. Co.*, 798 F.3d 1322, 1326 (10th Cir. 2015). In doing so, we view the record in the light most favorable to Dabbs, construing all reasonable inferences in her favor. *Id.*

---

[2] The district court also granted Shelter summary judgment on Dabbs's breach-of-contract claim, but Dabbs does not appeal that decision.

Summary judgment is appropriate only if Shelter shows that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Under Oklahoma law, an insurer owes its insured an implied duty of good faith and fair dealing.[3] *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005); *see also Allstate Ins. Co. v. Amick*, 680 P.2d 362, 364 (Okla. 1984) (holding that insurer's duty generally does not extend to third-party claimants). This duty requires an insurer to "take reasonable actions in handling" third-party claims. *Badillo*, 121 P.3d at 1093; *see also id.* at 1095–96 (describing duty as requiring insurer to diligently "investigat[e], negotiat[e], defen[d], and settle[]" third-party claims and to "timely and adequately inform[ its] insured of the progress of settlement negotiations"). An insurer, therefore, may be held liable to its insured for breaching that duty if the insurer unreasonably refuses to settle a third-party claim in bad faith. *See id.* at 1093. To prove that such a breach occurred, the insured must show that the insurer's allegedly unreasonable, bad-faith conduct amounts to "more than simple negligence." *Id.* at 1094. And a key issue in determining whether liability arises is

---

[3] Although Dabbs argues that Shelter's conduct was, in the alternative, unreasonable under Texas law, both she and Shelter agreed below—and continue to agree on appeal—that Oklahoma law governs this diversity case. We therefore apply Oklahoma law and do not address Dabbs's alternative arguments about Shelter acting unreasonably under Texas law. *See St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002) ("We assume, as the parties have, that Oklahoma state law should apply.").

"whether the insurer had a good faith belief in some justifiable reason for the actions it took." *Id.*

Applying these principles, the district court here found that Shelter could not be held liable for bad faith because Shelter's decision to assess the extent of Andrade's and Sierra's injuries and potential claims before accepting Calderon's policy-limits offers did not rise above simple negligence. The district court explained that Oklahoma law did not preclude Shelter from conducting a reasonable investigation before accepting Calderon's offer, or from "seek[ing] a comprehensive resolution of all [third-party] claims."[4] App. vol. 4, 979. And after noting that Gourrier's demands for an immediate settlement under "compressed time constraints . . . presented significant challenges," the district court determined that Shelter had "made a reasonable attempt" to shield Dabbs from excess liability by "conducting [a]

---

[4] Dabbs argues that the district court reached this conclusion without predicting how the Oklahoma Supreme Court would decide this issue. We disagree. Although the district court made no express prediction, it plainly based its decision on appropriate sources that would inform such a prediction—namely, analogous decisions from the Oklahoma Supreme Court. *See BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1176 (10th Cir. 2021) (noting that prediction may be informed by, among other sources, "[a]nalogous decisions from the [state] Supreme Court"). In any event, our de novo review remedies any purported failure on the district court's part to make a prediction below. *See Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250 (10th Cir. 2020) ("[A] federal district court's state-law determinations are entitled to no deference and are reviewed de novo." (alteration in original) (quoting *Roberts v. Printup*, 422 F.3d 1211, 1215 (10th Cir. 2005))). This standard of review also resolves Dabbs's argument that the district court improperly based its conclusion on a secondary source, as we do not rely on that source in our de novo review. *See Ball v. City of Dodge City, Kan.*, 67 F.3d 897, 899 (10th Cir. 1995) (explaining that, given our discretion to affirm on any ground supported by record, "we need not agree with all of the district court's reasoning").

diligent investigation, earnest negotiation, and competent (although unsuccessful) defense." *Id.* at 978–79. It thus granted summary judgment and dismissed Dabbs's bad-faith claim.

In challenging that decision, Dabbs first argues that the district court misapplied two Oklahoma Supreme Court cases—*Badillo v. Mid Century Insurance Co.*, 121 P.3d 1080, and *Allstate Insurance Co. v. Amick*, 680 P.2d 362. According to Dabbs, those decisions required Shelter to ignore her policy limits and prohibited Shelter from considering Andrade's and Sierra's potential claims. And because it is undisputed that Shelter did not ignore her policy limits and did consider Andrade's and Sierra's potential claims when evaluating Calderon's policy-limits offers, Dabbs contends that Shelter breached its duty of good faith and fair dealing. But as Shelter points out, it is Dabbs who misreads *Badillo* and *Allstate*.

In *Badillo*, insurers sent both a check for the maximum coverage amount under their insured's policy and a release of liability to a third-party claimant's attorneys. 121 P.3d at 1089. Before signing the release, however, the attorneys asked to speak with the insured to investigate whether another entity could be held liable for the claimant's injuries. *Id.* at 1089–90. Without consulting the insured, the insurers refused and ceased settlement negotiations for an extended period, prompting the third-party claimant to sue the insured and obtain an excess judgment. *Id.* at 1090–91. The insured then obtained a favorable judgment against his insurers for acting in bad faith during the negotiations. *Id.*

9

The Oklahoma Supreme Court upheld the judgment, rejecting the insurers' argument that they could not be held liable for bad faith because they had tendered the policy limits and never received or refused a policy-limits settlement offer. *Id.* at 1094. It explained that on the circumstances before it, an insurer could not avoid liability for bad faith based on "the mere tender of policy limits to a third-party claimant and/or the lack of an unconditional settlement offer from the third party." *Id.* "Rather than only involving offering the policy limits or responding to unconditional settlement offers," the Oklahoma Supreme Court reasoned, "the duty of good faith and fair dealing in this third[-]party situation required [the] insurers to reasonably respond to reasonable requests from [the claimant's] lawyers in an effort to settle the case for the protection of their insured." *Id.* Put differently, the "insurers were required to approach settlement as if the . . . policy limits did not exist and to ignore the policy limits during settlement negotiations." *Id.* at 1093.

Dabbs emphasizes the Oklahoma Supreme Court's admonition that insurers must ignore their insured's policy limits during settlement negotiations and argues that this admonition prohibited Shelter from considering her policy limits. But in doing so, she fails to appreciate the context in which the Oklahoma Supreme Court made this statement. Properly read in its context, this statement establishes the distinct and intuitive proposition that an insurer cannot escape liability for bad faith by merely "making an offer to settle for or within policy limits, or simply not refusing unconditional settlement offers within those limits." *Id.* at 1095. Or, as Shelter puts it, "the point of this statement [in *Badillo*] . . . was that the insurer could

not simply throw the policy limits at a claimant." Aplee. Br. 31. Instead, as we previously noted, an insurer must diligently investigate, negotiate, defend, and settle a third-party claim. *Badillo*, 121 P.3d at 1095. Dabbs's selective reliance on *Badillo* is therefore misplaced.

Dabbs also invokes *Allstate* to contend that Shelter could not consider Andrade's and Sierra's potential claims. In *Allstate*, the Oklahoma Supreme Court explained that "[i]n the absence of a contractual or statutory relationship" between third-party claimants and an insurer, "there is no duty [of good faith and fair dealing] which can be breached." 680 P.2d at 364. Since no such relationship existed in that case, the Oklahoma Supreme Court held that the insurer owed no duty to the third-party claimants, and so their bad-faith action could not proceed. *Id.* at 364–65. But nothing in *Allstate* suggests that an insurer cannot consider multiple third-party claims when deciding whether to accept a single claimant's policy-limits offer. Rather, *Allstate* simply reflects the principle that the insurer typically owes a duty of good faith and fair dealing only to its insured. Thus, Dabbs's reliance on *Allstate* is just as unavailing as her reliance on *Badillo*.

Having concluded that neither *Badillo* nor *Allstate* precluded Shelter from reasonably considering Dabbs's policy limits or Andrade's and Sierra's potential claims, we discern no error in the district court's decision to grant summary judgment on Dabbs's central allegation that Shelter acted in bad faith by not timely accepting

Calderon's policy-limits offers.[5] Even when viewed in the light most favorable to Dabbs, the record evidence establishes that Shelter had "a good[-]faith belief in some justifiable reason for" not timely accepting Calderon's offers. *Badillo*, 121 P.3d at 1094. Specifically, to protect Dabbs's interests, Shelter first needed to ensure that the $60,000 available under Dabbs's minimum-liability policy would cover all three claims, and Shelter could not confirm that fact when Calderon made his offers. *See id.* at 1093 ("In dealing with third parties, however, the insured's interests must be given faithful consideration."). To be sure, the record shows that Shelter knew Calderon's claim would likely exceed the amount allotted for a single claimant under Dabbs's policy because Calderon had a fractured leg that required surgery. But the record also reveals that Andrade and Sierra had sustained injuries and that Shelter did not know the extent of those injuries when it received Calderon's offers. Moreover, Shelter had little time to investigate the extent of Andrade's and Sierra's injuries and determine whether the limited funds available under Dabbs's policy could account for all three claims because, as the district court noted, Gourrier placed "compressed time constraints" on the offers. App. vol. 4, 978. And to make matters worse,

---

[5] In concluding as much, we do not suggest, as Shelter contends, that Oklahoma law *requires* insurers to consider multiple third-party claims when presented with an offer to settle one; we conclude only that neither *Badillo* nor *Allstate* prohibit insurers from doing so reasonably. And Dabbs does not seriously dispute this point: In her reply brief, she emphasizes that *Badillo* "does not permit consideration of competing claims *to the exclusion of all other facts and circumstances*." Rep. Br. 11 n.4. And at oral argument, Dabbs's counsel acknowledged that Shelter *could* consider Andrade's and Sierra's claims when evaluating Calderon's offer.

Gourrier himself hindered Shelter's investigation by failing to promptly respond to Shelter's multiple requests for information on Sierra's injuries. Given this undisputed record evidence, the district court correctly concluded that no reasonable jury could find that Shelter acted in bad faith by not timely accepting Calderon's policy-limits offers. *See Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1317 (10th Cir. 2019) (explaining that to survive summary judgment, "insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good[-]faith belief" in justifiable reason for its conduct (quoting *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993))).

Dabbs next contends that, aside from her core allegation about Calderon's policy-limits offers, Shelter's "entire course of conduct" was unreasonable and therefore in bad faith. Aplt. Br. 31. Specifically, she cites the district court's purported failure to consider her allegations that Shelter did not prepare Edwards to recognize that the policy limits under Texas law applied; did not timely seek and follow legal advice during the claims-handling process; did not recognize the likelihood of an excess judgment; and did not adequately monitor Calderon's state-court litigation. Dabbs is correct that the district court did not discuss those allegations in its summary-judgment order. But for good reason: Although Dabbs touched on some of these allegations in her amended complaint, she did not raise them in her summary-judgment briefing. Her arguments against summary judgment instead focused solely on her central allegation that Shelter acted in bad faith by not timely accepting Calderon's policy-limits offers. Because Dabbs did not preserve any

13

other arguments below and does not argue plain error on appeal, we treat them as waived and do not consider them here. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011).

But even if we overlooked this waiver, we are convinced that the record evidence even when viewed in Dabbs's favor would nevertheless establish that Shelter's conduct during the claims-handling process and Calderon's state-court proceedings was reasonable. *See Badillo*, 121 P.3d at 1093, 1096 (stating that insurer's duty requires it to "take reasonable actions in handling" third-party claims, including by conducting diligent "investigation, negotiation, defense[,] and settlement of [such] claims"). The record shows that two days after the accident, Shelter assigned Dabbs's file to Edwards, who immediately began conducting a diligent investigation. Upon receiving Dabbs's accident file, Edwards spoke with Andrade and Sierra to obtain critical preliminary information about their injuries. When she did so, Edwards learned from Sierra that Calderon had sustained a fractured leg, and Edwards attempted to speak with Calderon directly that same day.

Further, although Edwards initially believed that Oklahoma law provided the applicable policy limits for Dabbs's minimum-liability policy, she promptly agreed with Gourrier that Texas law provided the applicable policy limits—$30,000 per person, and $60,000 per accident. And when Gourrier advised Edwards that he represented Calderon and Sierra, Edwards communicated regularly with Gourrier. After receiving Calderon's policy-limits offers under compressed time constraints

14

and with threats to sue, moreover, Shelter promptly hired Hansen to help resolve Calderon's claim.

Meanwhile, Edwards not only continued her diligent work on Andrade's and Sierra's potential claims but also kept Dabbs apprised of Calderon's policy-limits offers and the possibility of an excess-judgment lawsuit. *See id.* at 1096 (listing failure to inform insured of settlement opportunities as "one factor" that affects whether insurer acted in bad faith). Indeed, Edwards's claim notes reveal that Dabbs acknowledged that possibility, was "very pleased with Shelter's handling of [Calderon's] claim[,] . . . and trust[ed Shelter's] judgment." App. vol. 2, 478. And as soon as Shelter determined that $30,000 could cover Andrade's and Sierra's potential claims, Edwards directed Hansen to settle Calderon's claim for $30,000, which Hansen promptly attempted to do.

Shelter's diligence continued even after Gourrier advised Edwards that Calderon would no longer accept a policy-limits offer to settle his claim. At Shelter's direction, Hansen continued settlement negotiations with Gourrier despite his assertion that he would "re[]consider settling on behalf of . . . Calderon" only if "Shelter would 'pad' their offer and come up with more than $30,000." *Id.* at 504. Dabbs could not afford to "pad" the offer, and Shelter, of course, was under no obligation to do so. And when Calderon did sue in state court, Shelter hired defense counsel for Dabbs as required under her policy and requested and received two status reports from her counsel as the case progressed. After Dabbs complained about her counsel's unresponsiveness, Shelter also replaced him with her husband's counsel,

who was already familiar with the state-court proceedings. That Dabbs ultimately lost in those proceedings is inconsequential. *See Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 137 (Okla. Civ. App. 2005) ("Resort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit.").

At bottom, the record evidence even when viewed in the light most favorable to Dabbs overwhelmingly shows that Shelter's entire course of conduct was reasonable. So even considering the allegations the district court purportedly ignored, no reasonable jury could find that Shelter failed to "take reasonable actions in handling" third-party claims.[6] *Badillo*, 121 P.3d at 1093.

## Conclusion

The district court did not misapply Oklahoma law in granting summary judgment for Shelter on Dabbs's bad-faith claim. No reasonable jury could find based on the record evidence before us that Shelter lacked a good-faith belief in a justifiable reason for not accepting Calderon's policy-limits offers. Dabbs also waived her argument that Shelter's entire course of conduct while handling Calderon's claim was unreasonable. Even if we were to ignore this waiver, no reasonable jury could find based on the record evidence before us that Shelter failed to take reasonable actions when handling Calderon's claim. We therefore affirm

---

[6] Dabbs also cites for the first time on appeal the district court's purported failure to consider that Shelter did not know Oklahoma law applied during the claims-handling process. But as explained, we do not consider arguments forfeited below and waived on appeal. *See Richison*, 634 F.3d at 1127–28.

Case 5:15-cv-00148-D   Document 159   Filed 07/07/23   Page 17 of 18
Appellate Case: 21-6169   Document: 010110883854   Date Filed: 07/07/2023   Page: 17

summary judgment in favor of Shelter on Dabbs's state-law claim for breach of the duty of good faith and fair dealing.

                                       Entered for the Court


                                       Nancy L. Moritz
                                       Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

| | |
|---|---|
| Christopher M. Wolpert<br>Clerk of Court | Jane K. Castro<br>Chief Deputy Clerk |

July 07, 2023

Mr. Derek Burch
Mr. James Scimeca
Burch, George & Germany
204 North Robinson Avenue, Suite 1500
Oklahoma City, OK 73102

**RE:** 21-6169, Dabbs v. Shelter Mutual Insurance Company
Dist/Ag docket: 5:15-CV-00148-D

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Ryan Deligans
    Andrew M Gunn

CMW/mlb